UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

JOHN BETTENCOURT, JR.   )
            )
    Plaintiff,    )
   v.       )   CIVIL ACTION
            )   NO.  10-11487-JGD
DAVID B. ARRUDA and   )
BRYAN C. McCARTHY,   )
            )
    Defendants.   )

## MEMORANDUM OF DECISION AND ORDER
## ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

November 1, 2012

DEIN, U.S.M.J.

## I.  INTRODUCTION

The plaintiff, John Bettencourt, Jr. ("Bettencourt"), has brought this action against

David B. Arruda ("Arruda") and Bryan C. McCarthy ("McCarthy"), both officers of the

Westport, Massachusetts Police Department, for allegedly violating his constitutional and

state law rights by grabbing him by the arm and spraying him with pepper spray during

the course of an altercation that occurred in connection with the arrest of the plaintiff's

brother on September 6, 2007.  By his complaint, Bettencourt has asserted civil rights

claims against the defendants, pursuant to 42 U.S.C. § 1983 ("Section 1983") and the

Massachusetts Civil Rights Act, Mass. Gen. Laws ch. 12 § 11I ("MCRA"), for unlawful

search and seizure, excessive force, violation of his right to equal protection, and

violation of his right to security of the person (Counts I and III).  He also has brought

claims against both officers for assault and battery (Count II) based on the alleged use of excessive force against him.

The matter is presently before the court on the "Defendants' Motion for Summary Judgment" (Docket No. 31), by which Arruda and McCarthy are seeking judgment as a matter of law on all of Bettencourt's claims against them. For all the reasons detailed below, the defendants' motion is ALLOWED IN PART and DENIED IN PART. Specifically, the motion is allowed with respect to all of the claims against McCarthy, and with respect to Bettencourt's claims against Arruda for violation of his right to equal protection and for deprivation of his rights under the MCRA. However, the motion is otherwise denied.

## II.  **STATEMENT OF FACTS**[1]

The incident giving rise to this case occurred on the evening of September 6, 2007. (See DF ¶ 3; PF ¶ 4). At that time, the plaintiff, Bettencourt, was 57 years old and was residing on Horseneck Road, which is located on the border of Westport and Dartmouth, Massachusetts. (DF ¶1; PF ¶ 1). Bettencourt's brother, Jeffrey Bettencourt ("Jeffrey"), and father, John Bettencourt, Sr. ("John"), were living on Horseneck Road as well. (DF ¶ 2). At approximately 6:00 p.m. that evening, a car accident took place in front of

---

[1]  The facts are derived from: (1) the "Defendants' Concise Statement of Undisputed Material Facts in Support of Summary Judgment" (Docket No. 34) ("DF") and the exhibits attached thereto ("Def. Ex. __"); (2) the 'Plaintiff's Responses to Defendants' Concise Statement of Undisputed Material Facts" (Docket No. 39) ("PR"); and (3) the "Plaintiff's Statement of Material Fact in Support of His Opposition to Defendants' Motion for Summary Judgment" (Docket No. 37) ("PF") and the exhibits attached thereto ("Pl. Ex. __").

Jeffrey's home.  (DF ¶ 3).  This incident ultimately led to Jeffrey's arrest and to the alleged conduct giving rise to the plaintiff's claims in this case.

After hearing a crash in front of his home, Jeffrey went to investigate and discovered that he knew the driver of the vehicle involved in the accident.  (DF ¶ 4; PF ¶¶ 7-8).  Jeffrey spoke with the driver, Ana Lavoie ("Lavoie"), and brought her cloth and ice packs to assist her.  (DF ¶ 4; PF ¶ 8).  He then went into his house to retrieve his cell phone so that Lavoie could call her family.  (DF ¶ 4).  By the time Jeffrey returned with the phone, the police and an ambulance had arrived at the scene.  (Id. ¶ 5).  The responding police officers included defendants Arruda and McCarthy, and a third officer from the Westport Police Department, Marshall Ronco ("Ronco").  (Id. ¶ 8).

## Defendants' Account of the Alleged Altercation

There is no dispute that after the police officers arrived at Horseneck Road and Jeffrey returned to the scene of the accident, an altercation occurred between the officers and members of the Bettencourt family.  However, the relevant details concerning the altercation and the plaintiff's involvement in the incident are in dispute.

According to the defendants, Lavoie, who had suffered a fractured jaw, was lying on a stretcher receiving treatment from paramedics when Jeffrey approached and asked if she needed to use his cell phone.  (Id. ¶ 10).  As the paramedics were attempting to place a collar around Lavoie's neck, Jeffrey persisted in asking Lavoie questions, which caused her to move her head.  (Id. ¶ 12; Def. Ex. 4 at 33-34).  The defendants claim that both the paramedics and a Lieutenant from the Westport Fire Department asked Jeffrey to stay

away from the ambulance so they could administer medical attention to Lavoie and her passenger and maintain the patients' privacy rights. (DF ¶ 13; Def. Exs. 8-9). However, Jeffrey refused their repeated requests to back away from the ambulance, and McCarthy was asked to assist in removing Jeffrey from the area. (DF ¶¶ 13-14; Def. Ex. 4 at 34).

McCarthy claims that he approached Jeffrey and detected the smell of alcohol. (DF ¶ 15; Def. Ex. 4 at 36). He also determined, based on Jeffrey's conduct and appearance, that Jeffrey was intoxicated. (Id.). According to McCarthy, he asked Jeffrey to step away from the ambulance and leave the area, but Jeffrey refused to do so. (DF ¶¶ 16-18; Def. Ex. 6). Instead, Jeffrey began yelling and swearing at the officers. (DF ¶¶ 18-20; Def. Ex. 1 at 29; Def. Ex. 4 at 38-39). After Jeffrey failed to comply with the officers' warning to calm down, the officers decided to place Jeffrey under arrest. (DF ¶¶ 21-23; Def. Ex. 4 at 38-39, 42; Def. Ex. 5). The defendants claim that efforts by members of the Bettencourt family to interfere with Jeffrey's arrest further exacerbated the situation and created a melee between the officers and the Bettencourts.

Specifically, the defendants claim that McCarthy and Ronco approached Jeffrey in order to detain him, but that Jeffrey insisted he was not going to jail, and moved his arms in such a way that McCarthy was unable to place him in handcuffs. (DF ¶ 25; Def. Ex. 4 at 42-43). As McCarthy struggled to effectuate the arrest, members of the Bettencourt family began to circle around the officers, yelling and pushing and attempting to pull Jeffrey away. (DF ¶ 27; Def. Ex. 4 at 44). McCarthy described the scene as a struggle, with various members of the Bettencourt family pulling at Jeffrey and at the officers.

(Def. Ex. 4 at 46).  At one point, McCarthy felt someone pull at his back and his gun belt, and at another point someone grabbed the handcuffs out of his hands and threw them into the yard.  (DF ¶¶ 28-29; Def. Ex. 4 at 44-47).  Arruda, who was able to reach Jeffrey and place him in handcuffs, similarly described the incident as a mob scene, with members of the Bettencourt family kicking at Arruda's legs and pulling at Jeffrey in every direction. (Def. Ex. 2 at 59, 72).

It is undisputed that during the course of the officers' interaction with Jeffrey, McCarthy sprayed Jeffrey with pepper spray.  (DF ¶ 44; PR ¶ 45).  However, the parties dispute whether the defendants also used pepper spray on Bettencourt and the plaintiff's father, John.  (DF ¶ 45; PR ¶ 45).  According to the defendants, both Bettencourt and John approached the officers as they were struggling to apprehend Jeffrey.  (DF ¶¶ 33, 35).  However, the officers deny that they used pepper spray on either of those individuals or that they otherwise caused them harm.  (See id. ¶¶ 39-45).

## Plaintiff's Account of the Alleged Altercation

Bettencourt's account of the alleged altercation differs in various material respects from the defendants' version of events.  As an initial matter, the evidence presented by the plaintiff shows that Jeffrey had been home from work for only about ten minutes and had taken only one sip of beer when he heard the crash from the car accident in front of his home.  (PF ¶ 5; Pl. Ex. 3 at 9-10).  Moreover, according to Lavoie and members of Jeffrey's family who had an opportunity to observe him on the evening of September 6, 2007, Jeffrey did not smell of alcohol and did not appear to be intoxicated.  (See, e.g., Pl.

Ex. 4 at 18; Pl. Ex. 5 at 30; Pl. Ex. 6 at 29).  In addition, the plaintiff has presented

evidence showing that Jeffrey was not interfering with the paramedics' efforts to treat

Lavoie, that the police officers overreacted to Jeffrey's conduct, and that the officers used

force against Bettencourt and his father which was unprovoked and unjustified.

Specifically, according to the plaintiff, Lavoie was lying in the ambulance when

Jeffrey approached her to ask if she wanted him to call her family.  (PF ¶¶ 11, 13; Pl. Ex.

3 at 15; Pl. Ex. 4 at 46).  At that point, the paramedics had not yet begun to administer

treatment, and none of the paramedics or ambulance personnel told Jeffrey to move away

from the ambulance.  (PF ¶ 12; Pl. Ex. 3 at 15; Pl. Ex. 4 at 46).  Instead, the ambulance

driver informed Jeffrey that he was about to take Lavoie to the hospital, and that there

was no time for Jeffrey to make a phone call.  (Pl. Ex. 3 at 15).

The plaintiff claims that McCarthy subsequently approached Jeffrey and asked

him where he lived.  (Id. at 16).  After Jeffrey responded, McCarthy stated, "I suggest

you get the hell over there."  (Id.).  Jeffrey complied and headed across the road to his

house.  (Id. at 17).  As he was returning to his home, Jeffrey saw his father, John,

standing nearby and observing the scene.  (Id.).  Jeffrey then turned to his father and,

referring to McCarthy, stated, "this guy is a fuckin' dick."  (Id.).  According to

Bettencourt, McCarthy reacted to Jeffrey's comment by confronting Jeffrey and telling

him that he was under arrest.  (PF ¶ 19; Pl. Ex. 3 at 20).

The plaintiff does not dispute that Jeffrey resisted McCarthy's efforts to arrest him

by refusing to put his hands together so McCarthy could place him in handcuffs.  (PF

¶ 21; Pl. Ex. 3 at 21-23).  However, he claims that Jeffrey's conduct was non-violent, and that McCarthy refused to tell Jeffrey why he was being arrested.  (PF ¶¶ 20-21; Pl. Ex. 3 at 22-23).  He also claims that McCarthy and Ronco overreacted to Jeffrey's actions by beating him in the legs repeatedly using their billy bats.  (PF ¶ 22; Pl. Ex. 3 at 23).  Jeffrey estimated that the officers hit him approximately 15 to 20 times in total.  (Id.).

Bettencourt contends that as the officers were beating Jeffrey, John approached the officers in an effort to calm everyone down.  (PF ¶ 23).  Arruda responded by telling John to "get the F[uck] out of here and mind your F[uckin'] business."  (Pl. Ex. 2 at 11).  However, before John had an opportunity to walk away, Arruda grabbed John by the shirt and threw him against a telephone pole.  (Id. at 13, 27).  According to the plaintiff, Arruda then proceeded to spray John with pepper spray.  (Id. at 13).

Throughout the course of the Bettencourts' confrontation with the police officers, the plaintiff had been observing the incident from across the street.  (PF ¶ 31; see also Pl. Ex. 1 at 29).  Bettencourt claims that after he witnessed Arruda throw his 84-year old father against the telephone pole, he crossed the street to try to bring calm to the situation.  (PF ¶ 32; Pl. Ex. 1 at 58).  However, before he had an opportunity to reason with the police officers, Arruda grabbed Bettencourt, pulled him by the arm, and sprayed him in the face with pepperspray.  (PF ¶¶ 33-35; Pl. Ex. 1 at 29-30, 117-18; Pl. Ex. 10 at 17-18).  As detailed below, the plaintiff claims that he has sustained permanent damage to his shoulder as a result of Arruda's use of force against him.

Bettencourt denies that anyone from the Bettencourt family was circling, bumping, pushing or yelling at the officers at any time leading up to the point when he and his father approached the officers, and he contends that no one from his family engaged in criminal, violent or threatening behavior.  (PF ¶¶ 28-30; PR ¶ 53).  Bettencourt also denies that he ever acted in a violent or aggressive manner.  (PF ¶ 40).  In fact, it is undisputed that McCarthy had no recollection of seeing the plaintiff at any point during the course of the incident.  (PF ¶ 41; Pl. Ex. 13 at 62).

### Events Following the Alleged Altercation

It is undisputed that following the incident with the defendants, Bettencourt got into his father's car and drove to the home of Deputy Police Chief John Gifford ("Gifford") to request assistance.  (DF ¶ 46; PF ¶ 37).  According to Bettencourt, Gifford agreed to provide assistance, but he did not go to Horseneck Road that evening, and there is no evidence that he had any involvement in the parties' dispute.  (DF ¶ 47; PF ¶ 38).

When Bettencourt returned to Horseneck Road, he spoke with Arruda.  (DF ¶ 49; PF ¶ 39).  According to Bettencourt, Arruda apologized for what had happened, and suggested that Bettencourt flush his eyes out with milk to ease the pain from the pepper spray.  (Pl. Ex. 1 at 30-31).  Additionally, ambulance workers were sent to the plaintiff's home to provide him medical care.  (DF ¶ 50).  However, Bettencourt declined their offer to take him to the hospital for treatment.  (Id.).

Jeffrey ultimately was arrested for disorderly conduct, resisting arrest, and impeding an investigation, but the charges against him all were dismissed.  (DF ¶ 51; PR

¶ 51).  Neither Bettencourt nor any other members of his family were arrested or charged with any offenses.  (DF ¶¶ 52-53; PF ¶ 42).

The plaintiff claims that as a result of the defendants' actions, he suffered a repeat tear of his left rotator cuff, which had been repaired about a month before the incident. (PF ¶ 45; Pl. Ex. 14).  Although Bettencourt underwent arthroscopic surgery for the tear, his surgeon has concluded that the plaintiff's shoulder is no longer reparable due to tendon loss.  (PF ¶ 46; Pl. Ex. 14).  Accordingly, the plaintiff claims that as a result of the incident with the police officers, he has sustained permanent injury to his shoulder that will severely limit his ability to work on the farm that he runs with other members of his family, and will preclude him from participating in activities involving any type of heavy lifting.  (PF ¶¶ 46-48; Pl. Ex. 14).

Additional factual details relevant to this court's analysis are described below where appropriate.

### III.  ANALYSIS

#### A.    Summary Judgment Standard of Review

Summary judgment is appropriate when the moving party shows, based on the discovery and disclosure materials on file, and any affidavits, "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "[A]n issue is 'genuine' if it 'may reasonably be resolved in favor of either party.'"  Vineberg v. Bissonnette, 548 F.3d 50, 56 (1st Cir. 2008) (quoting Garside v. Osco Drug, Inc., 895 F.2d 46, 48 (1st Cir. 1990)).  "A fact is material only if it

possesses the capacity to sway the outcome of the litigation under the applicable law." Id. (quotations, punctuation and citations omitted).

The moving party bears the initial burden of establishing that there is no genuine issue of material fact.  See Borges ex rel. S.M.B.W. v. Serrano-Isern, 605 F.3d 1, 5 (1st Cir. 2010).  If that burden is met, the opposing party can avoid summary judgment only by providing properly supported evidence of disputed material facts that would require trial.  LeBlanc v. Great Am. Ins. Co., 6 F.3d 836, 841 (1st Cir. 1993), cert. denied, 511 U.S. 1018, 114 S. Ct. 1398, 128 L. Ed. 2d 72 (1994).  Accordingly, "the nonmoving party 'may not rest upon mere allegation or denials of his pleading,'" but must set forth specific facts showing that there is a genuine issue for trial.  Id. (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256, 106 S. Ct. 2505, 2514, 91 L. Ed. 2d 202 (1986)).  The court must view the record in the light most favorable to the non-moving party and indulge all reasonable inferences in that party's favor.  See Vineberg, 548 F.3d at 56.  "If, after viewing the record in the non-moving party's favor, the Court determines that no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law, summary judgment is appropriate."  Walsh v. Town of Lakeville, 431 F. Supp. 2d 134, 143 (D. Mass. 2006).

## B.      Count I: Alleged Violation of Civil Rights Under Section 1983

In Count I of his complaint, Bettencourt alleges that McCarthy and Arruda violated his civil rights under Section 1983 by subjecting him to an unlawful search and seizure, using excessive force against him, depriving him of his right to equal protection,

and violating his right to security of the person.  Section 1983 "is not itself a source of

substantive rights, but merely provides a method for vindicating federal rights elsewhere

conferred."  Graham v. Connor, 490 U.S. 386, 393-94, 109 S. Ct. 1865, 1870, 104 L. Ed.

2d 443 (1989) (quotations and citation omitted).  It provides:

> Every person who, under color of any statute, ordinance, regulation,
> custom, or usage, of any State or Territory or the District of
> Columbia, subjects, or causes to be subjected, any citizen of the
> United States or other person within the jurisdiction thereof to the
> deprivation of any rights, privileges, or immunities secured by the
> Constitution and laws, shall be liable to the party injured in an action
> at law, suit in equity, or other proper proceeding for redress....

42 U.S.C. § 1983.

"A claim under section 1983 has two essential elements.  First, the challenged

conduct must be attributable to a person acting under color of state law" and "second, the

conduct must have worked a denial of rights secured by the Constitution or by federal

law."  Soto v. Flores, 103 F.3d 1056, 1061 (1st Cir. 1997), cert. denied, 522 U.S. 819, 118

S. Ct. 71, 139 L. Ed. 2d 32 (1997).  In the instant case, the defendants do not dispute that

they were acting under color of state law on the evening of September 6, 2007.  However,

they contend that their conduct did not deprive the plaintiff of his constitutional rights,

and that even if they acted unlawfully, they are entitled to qualified immunity with

respect to Bettencourt's civil rights claims.  For the reasons that follow, this court finds

that the plaintiff has failed to present sufficient facts to show that McCarthy deprived him

of any constitutional rights or that Arruda violated his right to equal protection.

However, the record shows that there are disputed issues of material fact which preclude

summary judgment for Arruda with respect to Bettencourt's claims for unlawful search and seizure and use of excessive force.[2]

### 1.    Bettencourt's Fourth Amendment Claims

Bettencourt's claims for illegal search and seizure and excessive force arise under the Fourth Amendment to the Constitution.  See Graham, 490 U.S. at 395, 109 S. Ct. at 1871 (holding that "*all* claims that law enforcement officers have used excessive force . . . in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment"); United States v. Mendenhall, 446 U.S. 544, 551, 100 S. Ct. 1870, 1875, 64 L. Ed. 2d 497 (1980) ("The Fourth Amendment's require-ment that searches and seizures be founded upon an objective justification, governs all seizures of the person, including seizures that involve only a brief detention short of traditional arrest" (internal quotations and citations omitted)).  "The Fourth Amendment provides that 'the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . .'" Mendenhall, 446 U.S. at 550, 100 S. Ct. at 1875 (quoting U.S. Const. Amend. IV).  The defendants contend that Bettencourt cannot prevail on these claims because there is no evidence that a Fourth Amendment seizure occurred during the course of the parties'

---

[2]  This court has construed Bettencourt's claim for violation of the right to security of the person as redundant of his claim for illegal search and seizure.  See Horton v. California, 496 U.S. 128, 133, 110 S. Ct. 2301, 2305-06, 110 L. Ed. 2d 112 (1990) (explaining that the Fourth Amendment protects "[t]he right of the people to be secure in their persons" against unreasonable searches and seizures).

altercation, and because any amount of force that the defendants may have applied was reasonable under the circumstances.  (Def. Mem. at 6-8).  Because there is no evidence that McCarthy engaged in any conduct that could be construed as a seizure of the plaintiff, this court finds that he is entitled to summary judgment on Bettencourt's Fourth Amendment claims.  However, the defendants have not shown that Arruda is entitled to summary judgment on Bettencourt's claims for illegal seizure and excessive force.

### Evidence of a Seizure

"Under the Fourth Amendment, a seizure occurs when a police officer, by means of physical force or a show of authority, has in some way restrained the liberty of a citizen."  United States v. Sealey, 30 F.3d 7, 9 (1st Cir. 1994).  An arrest is not necessary to effectuate a seizure.  The "application of physical force to restrain movement, even when it is ultimately unsuccessful[,]" is sufficient to constitute a seizure under the Fourth Amendment.  California v. Hodari D., 499 U.S. 621, 626, 111 S. Ct. 1547, 1550, 113 L. Ed. 2d 690 (1991).  Thus, "[i]t must be recognized that whenever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person" within the meaning of the Fourth Amendment, even if the encounter does not lead to an arrest in the traditional sense.  Terry v. State of Ohio, 392 U.S. 1, 16, 88 S. Ct. 1868, 1877 (1968).

In the instant case, a reasonable factfinder could conclude that Bettencourt was subjected to physical force that was applied by Arruda for the purpose of restraining his movement and deprived him of his freedom to walk away.  As described above, Bettencourt has submitted evidence showing that as he was attempting to speak with the

-13-

officers, Arruda pulled him by the arm and sprayed him with pepper spray.  (Pl. Ex. 1 at

29-30, 117-18; Pl. Ex. 10 at 17-18).   When viewed in the light most favorable to the

plaintiff, this evidence is sufficient to show that a Fourth Amendment seizure took place.

See Young v. County of Los Angeles, 655 F.3d 1156, 1161 (9th Cir. 2011) (finding that

pepper spray is a form of force which "present[s] a significant intrusion upon an

individual's liberty interests"); Hamilton v. City of Olympia, 687 F. Supp. 2d 1231, 1241

(W.D. Wash. 2009) (evidence that officer sprayed plaintiff with pepper spray supported

conclusion that plaintiff's freedom of movement was terminated and he was seized for

purposes of the Fourth Amendment); Yelverton v. Vargo, 386 F. Supp. 2d 1224, 1228

(M.D. Ala. 2005) (finding that officer's pepper spraying of suspect "constituted a seizure

even though it did not stop him").  While the defendants argue that the plaintiff's descrip-

tion of Arruda's conduct is not credible when considered with other evidence in the

record (see Def. Mem. at 7-8), it is not for the court to make such a credibility deter-

mination in the context of a motion for summary judgment.  See Vineberg, 548 F.3d at

56.  Rather, viewing the record in the light most favorable to the non-moving party

compels the conclusion that plaintiff has submitted sufficient evidence that he was seized

by Arruda within the meaning of the Fourth Amendment.

The state of the record with respect to McCarthy, however, is different.  In order

to prevail on a claim under Section 1983, the plaintiff must "prove not only a deprivation

of [a] federal right, but also that the defendant's conduct was a cause in fact of the

alleged deprivation."  Soto, 103 F.3d at 1062.  While the plaintiff has put forth evidence

showing that Arruda used physical force against him which resulted in a restraint on his freedom, he has not done so with respect to McCarthy, and there is no evidence that McCarthy said or did anything to limit Bettencourt's ability to walk away.[3]  For his part, McCarthy had no recollection of even seeing Bettencourt at any time during the course of the altercation.  (PF ¶ 41; Pl. Ex. 13 at 62).  Accordingly, McCarthy is entitled to judgment as a matter of law with respect to Bettencourt's Fourth Amendment claims.

Finally, there is no merit to the defendants' argument that Bettencourt could not have been subjected to an illegal seizure because he was able to get into his father's car and drive himself to Gifford's house after he was sprayed with pepper spray.  (Def. Mem. at 8).  As the Supreme Court has emphasized, a Fourth Amendment seizure may occur "even though the subject does not yield."  Hodari D., 499 U.S. at 626, 111 S. Ct. at 1550.  Thus, Arruda's alleged act of grabbing Bettencourt by the arm and pepper spraying him "constituted a seizure even though it did not stop him."  Yelverton, 386 F. Supp. 2d at 1228.

## Alleged Use of Excessive Force

The defendants contend that even if a seizure occurred, Arruda is entitled to judgment as a matter of law on Bettencourt's excessive force claim because the amount

---

[3]  Bettencourt has asserted that this court can "infer" that the fact that McCarthy pepper sprayed Jeffrey "affected John Bettencort, Jr. and/or John Bettencourt, Sr."  (See PR ¶ 45).  Even assuming this to be a proper inference, it does not allege a Fourth Amendment seizure.

of force he used against the plaintiff was reasonable under the circumstances.[4]  (Def.

Mem. at 9-11).  Again, this court finds that there are disputed issues of fact which

preclude summary judgment for Arruda on this basis.

The Supreme Court "has long recognized that the right to make an arrest or

investigatory stop necessarily carries with it the right to use some degree of physical

coercion or threat thereof to effect it."  Graham, 490 U.S. at 396, 109 S. Ct. at 1871-72.

"Determining whether the force used to effect a particular seizure is 'reasonable' under

the Fourth Amendment requires a careful balancing of the nature and quality of the

intrusion on the individual's Fourth Amendment interests against the countervailing

governmental interests at stake."  Id. at 396, 109 S. Ct. at 1871.  Thus, the critical ques-

tion for purposes of an excessive force claim is "whether 'the defendant officer employed

force that was unreasonable under the circumstances.'"  Raiche v. Pietroski, 623 F.3d 30,

36 (1st Cir. 2010) (quoting Jennings v. Jones, 499 F.3d 2, 11 (1st Cir. 2007)).

In applying the test for reasonableness under the Fourth Amendment, courts must

pay "careful attention to the facts and circumstances of each particular case, including the

severity of the crime at issue, whether the suspect poses an immediate threat to the safety

of officers and others, and whether he is actively resisting arrest or attempting to evade

arrest by flight."  Graham, 490 U.S. at 396, 109 S. Ct. at 1872.  Furthermore, it is

---

[4]  The defendants have not argued that the reasonableness of Arruda's actions defeats
Bettencourt's claim for unlawful seizure.  (See Def. Mem. at 9-11). Therefore, this court has
confined its analysis regarding the reasonableness of Arruda's actions to Bettencourt's claim for
excessive force.

important to remain mindful that "[t]he 'reasonableness' of a particular use of force must

be judged from the perspective of a reasonable officer on the scene, rather than with the

20/20 vision of hindsight." Id.  As the Supreme Court has cautioned,

> [n]ot every push or shove, even if it may later seem unnecessary in
> the peace of a judge's chambers, violates the Fourth Amendment.
> The calculus of reasonableness must embody allowance for the fact
> that police officers are often forced to make split-second judgments
> – in circumstances that are tense, uncertain, and rapidly evolving –
> about the amount of force that is necessary in a particular situation.

Id. at 396-97, 109 S. Ct. at 1872 (internal quotations and citation omitted).

Where, as here, "the parties offer diametrically opposite versions of the facts, each

founded on first-hand knowledge, [the court] must ask whether the account propounded

by the nonmovant suffices to thwart the swing of the summary judgment ax." Morelli v.

Webster, 552 F.3d 12, 18 (1st Cir. 2009).  This court finds that in this case, that question

must be answered in the affirmative.  As described above, the evidence submitted by the

plaintiff shows that Arruda forcefully grabbed the plaintiff's arm and sprayed him in the

face with pepper spray.  It also shows that the officer was acting without provocation at

the time of the alleged attack.  In particular, the facts presented by Bettencourt show that

at the time of the alleged use of force, the plaintiff was not engaged in any criminal

activity and was not acting in a manner that would have posed a threat to Arruda or

anyone else at the scene.  Furthermore, there is no evidence indicating that Bettencourt

ever resisted or attempted to evade arrest.  Under the scenario described by the plaintiff's

evidence, Arruda's alleged conduct "would be 'plainly in excess of the force necessary

under the circumstances,' and thus excessive under the Fourth Amendment." <u>Young</u>, 655 F.3d at 1167 (quoting <u>Headwaters Forest Defense v. County of Humboldt</u>, 276 F.3d 1125, 1131 (9th Cir. 2002)).  <u>See also Hamilton</u>, 687 F. Supp. 2d at 1242-43 (finding that defendants were unable to establish that the use of force was reasonable for purposes of their motion for summary judgment where plaintiff had probably not violated any law, facts presented by plaintiff showed that he posed no immediate threat to the safety of the officers or others, and there was no evidence that plaintiff was evading arrest).  There-fore, the defendants have not shown that Arruda is entitled to summary judgment on Bettencourt's claim of excessive force.

The defendants' reliance on their own version of events to establish the reason-ableness of Arruda's actions is unpersuasive in light of this court's obligation to view the record in favor of the plaintiff.  In particular, their assertion that Arruda was acting within the context of a "melee" and a "mob scene" in which members of the Bettencourt family were threatening the officers and interfering with Jeffrey's arrest, assumes that their view of the facts is correct.  (<u>See</u> Def. Mem. at 10).  Under the circumstances presented by Bettencourt, no one from the Bettencourt family was acting in a threatening manner or was interfering with the officers' efforts to detain Jeffrey, and the plaintiff did nothing to threaten or antagonize the officers at the scene.  (<u>See</u> PF ¶¶ 28-30, 40).  Therefore, when the facts are viewed in favor of the plaintiff, a factfinder easily could conclude that Arruda's use of force was excessive.

The defendants' effort to compare this case to the facts in <u>Jackson v. City of</u> <u>Bremerton</u>, 268 F.3d 646 (9th Cir. 2001) is similarly unpersuasive.  In that case, the court determined that the use of force by police officers in connection with the plaintiff's arrest was reasonable where the plaintiff was among a group of 30 to 50 individuals who began yelling at and fighting with police in a public park; the plaintiff directly interfered with a police officer's effort to arrest another member of plaintiff's party; the plaintiff failed to comply with the officers' orders to move away from the area; and the plaintiff's actions posed an immediate threat to the officers' personal safety and ability to control the crowd.  <u>See</u> <u>Jackson</u>, 268 F.3d at 649-50, 652-53.  Under Bettencourt's version of the facts in the present matter, no one other than Jeffrey was involved in a dispute with the police, and the plaintiff did nothing more than approach the officers in an attempt to bring calm to the situation.  (<u>See</u> PF ¶¶ 32-34; Pl. Ex. 1 at 29-30).  Therefore, a factfinder could conclude that there was no justification for Arruda's use of force against Bettencourt, and that Arruda's actions deprived Bettencourt of his rights under the Fourth Amendment.

## **Qualified Immunity**

The defendants contend that even if the evidence supports the plaintiff's claim that his Fourth Amendment rights were violated, Arruda is entitled to protection from liability pursuant to the doctrine of qualified immunity.  (Def. Mem. at 11-12).  Again, this argument must fail because the relevant facts are in dispute.

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or

constitutional rights of which a reasonable person would have known.'"  Pearson v.

Callahan, 555 U.S. 223, 231, 129 S. Ct. 808, 815, 172 L. Ed. 2d 565 (2009) (quoting

Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S. Ct. 2727, 2738, 73 L. Ed. 2d 396

(1982)).  "Qualified immunity balances two important interests – the need to hold public

officials accountable when they exercise power irresponsibly and the need to shield

officials from harassment, distraction, and liability when they perform their duties

reasonably.  The protection of qualified immunity applies regardless of whether the

government official's error is a mistake of law, a mistake of fact, or a mistake based on

mixed questions of law and fact."  Pearson, 555 U.S. at 231, 129 S. Ct. at 815 (quotations

and citations omitted).

       The determination whether an official is entitled to qualified immunity requires an

assessment as to whether the facts alleged or shown by the plaintiff "make out a violation

of a constitutional right" and, if so, "whether the right at issue was clearly established at

the time of defendant's alleged misconduct."  Id. at 232, 129 S. Ct. at 816 (quotations and

citations omitted).  "[T]he second, 'clearly established,' step of the qualified immunity

analysis . . . in turn, has two aspects."  Maldonado v. Fontanes, 568 F.3d 263, 269 (1st

Cir. 2009).  As the First Circuit has described:

              One aspect of the analysis focuses on the clarity of the law at the
              time of the alleged civil rights violation.  To overcome qualified
              immunity, the contours of the right must be sufficiently clear that a
              reasonable official would understand that what he is doing violates
              that right.  The other aspect focuses more concretely on the facts of
              the particular case and whether a reasonable defendant would have
              understood that his conduct violated the plaintiffs' constitutional

rights.  Indeed, it is important to emphasize that this inquiry must be undertaken in light of the specific context of the case, not as a broad general proposition.

Id. (quotations, citations and alterations omitted).  Thus, "the relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."  Id. (quotations, citations and alterations omitted).

The defendants argue that Bettencourt cannot overcome the clearly established prong of the qualified immunity analysis because a reasonable officer in Arruda's position would have understood that "there was no Fourth Amendment seizure in the first place[.]"  (Def. Mem. at 12).  This court disagrees.  At the time of the alleged incident in September 2007, it had long been established that a police officer seizes a person when the "officer accosts an individual and restrains his freedom to walk away[,]" even if the officer's actions do not result in an arrest.  Terry, 392 U.S. at 16, 88 S. Ct. at 1877.  Based on the plaintiff's account of the incident, a reasonable officer in Arruda's position would have understood that grabbing someone by the arm and spraying him in the face with pepper spray constituted a "seizure" for purposes of the Fourth Amendment.

The defendants further contend that Arruda is entitled to qualified immunity because a reasonable officer faced with "the 'melee' and 'mob scene' surrounding and interfering with Jeffrey's arrest" would have understood that his use of force against Bettencourt was reasonable.  (Def. Mem. at 12).  Again, however, this argument is premised on the defendant's version of events.  The defendants do not and cannot argue

that under the circumstances described by the plaintiff, the unwarranted use of pepper

spray against an individual who was not interfering with an arrest, was posing no threat,

and was making no attempt to evade or resist his own arrest was lawful.  See Young, 655

F.3d at 1168 (finding that "well-established principles of Fourth Amendment law sufficed

to put [police officer] on notice . . . that to pepper spray an individual and strike him with

a baton for disobeying a traffic officer's order to get back in his car . . . constituted a

violation of the Fourth Amendment"); Hamilton, 687 F. Supp. 2d at 1243 (finding that "a

reasonable officer would have had fair notice that pepper spraying an individual not

suspected of violating a crime was a violation of that person's constitutional rights").  See

also Morelli, 552 F.3d at 24 (finding that defendant's actions in "yanking the arm of an

unarmed and non-violent person, suspected only of the theft of $20, and pinning her

against a wall for three to four minutes with sufficient force to tear her rotator cuff" were

"outside the universe of protected mistakes" subject to qualified immunity).  Because it

would have been clear to a reasonable officer that Arruda's conduct in grabbing

Bettencourt hard enough to injure his rotator cuff and pepper spraying him in the face

was unreasonably excessive, the defendant is not entitled to summary judgment on the

grounds of qualified immunity.

## 2.      Claim for Deprivation of Equal Protection

The defendants also have moved for summary judgment on Bettencourt's claim

that McCarthy and Arruda are liable under Section 1983 because they deprived him of his

constitutional right to equal protection.  (Def. Mem. at 11).  Because the plaintiff has

failed to set forth any facts or present any arguments showing that his equal protection rights were violated, the defendants are entitled to judgment as a matter of law on this claim.

"The Equal Protection Clause of the Fourteenth Amendment requires that persons who are similarly situated be treated alike." Restucci v. Clarke, 669 F. Supp. 2d 150, 158 (D. Mass. 2009). Therefore, in order to establish an equal protection claim, the plaintiff must show that "compared with others similarly situated, he was selectively treated based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious bad faith intent to injure a person." Tapalian v. Tusino, 377 F.3d 1, 5 (1st Cir. 2004) (quoting Barrington Cove Ltd. P'ship v. R.I. Hous. and Mortgage Fin. Corp., 246 F.3d 1, 7 (1st Cir. 2001)) (punctuation and emphasis omitted). In the instant case, Bettencourt has not presented any facts indicating that the defendants treated him any differently than they treated similarly situated individuals, or that their treatment of him was based on any impermissible considerations. Nor has he attempted to explain why the defendants are not entitled to summary judgment on this claim. Therefore, the defendants' motion is allowed with respect to Bettencourt's claim for violation of his right to equal protection.

### C.    Count II: State Law Claim for Assault and Battery

In Count II of his complaint, Bettencourt is seeking to hold the defendants liable for assault and battery based on their alleged use of excessive force against him. For the

reasons detailed herein, the defendants' motion for summary judgment on this claim is allowed with respect to McCarthy, but denied with respect to Arruda.

"Assault and battery is the 'intentional and unjustified use of force upon the person of another, however slight, or the intentional doing of a wanton or grossly negligent act causing personal injury to another.'" Sietens v. Joseph, 238 F. Supp. 2d 366, 380 (D. Mass. 2003) (quoting Jesionowski v. Beck, 937 F. Supp. 95, 105 (D. Mass. 1996)). However, as in the case of a Fourth Amendment seizure, "Massachusetts law also allows an officer to use reasonable force in conducting a lawful arrest" or seizure. Raiche, 623 F.3d at 40. Accordingly, where, as here, "a plaintiff alleges both a § 1983 excessive force claim and common law claims for assault and battery, [the] determination of reasonableness of the force used under § 1983 controls [the] determination of reason-ableness of the force used under the common law assault and battery claims." Id.

As detailed above, McCarthy is entitled to summary judgment on Bettencourt's excessive force claim because he did not conduct a seizure of the plaintiff, much less use any excessive force against him. Therefore, he is entitled to summary judgment on Bettencourt's claim for assault and battery as well. However, because the relevant facts relating to Arruda's use of excessive force are in dispute, the motion for summary judgment on Count II is denied with respect to Arruda.

### D.    Count III: Claims Under the Massachusetts Civil Rights Act

Finally, in Count III, Bettencourt asserts that McCarthy and Arruda violated his rights under the MCRA, Mass. Gen. Laws ch. 12, § 11I. Because this court finds that

Bettencourt has provided no evidence showing that either of the defendants interfered with or attempted to interfere with his secured rights by way of threats, intimidation or coercion, the defendants' motion for summary judgment is allowed with respect to this Count.

To prevail on a claim under the MCRA,[5] "a plaintiff must show that (1) his exercise or enjoyment of rights secured by the constitution or laws of either the United States or the Commonwealth of Massachusetts (2) has been interfered with, or attempted to be interfered with, and (3) that the interference or attempted interference was by threats, intimidation or coercion." Farrah ex rel. Estate of Santana v. Gondella, 725 F. Supp. 2d 238, 247 (D. Mass. 2010). "The purpose of the MCRA is to provide under state law a remedy 'coextensive with 42 U.S.C. § 1983, except that the Federal statute requires State action whereas its State counterpart does not.'" Id. (quoting Batchelder v. Allied Stores Corp., 393 Mass. 819, 822-23, 473 N.E. 2d 1128, 1131 (1985)). Furthermore, under the MCRA, but not 42 U.S.C. § 1983, the plaintiff must identify a federal or state right that has been "interfered with by threats, intimidation, or coercion." Flesner v. Technical Commc'ns Corp., 410 Mass. 805, 818, 575 N.E. 2d 1107, 1115 (1991). In the instant

---

[5] The MCRA, Mass. Gen. Laws ch. 12, § 11H, provides in relevant part: "Whenever any person or persons, whether or not acting under color of law, interfere by threats, intimidation or coercion, or attempt to interfere by threats, intimidation or coercion, with the exercise or enjoyment by any other person or persons of rights secured by the constitution or laws of the United States, or of rights secured by the constitution or laws of the commonwealth, the attorney general may bring a civil action for injunctive or other appropriate equitable relief in order to protect the peaceable exercise or enjoyment of the right or rights secured." Mass. Gen. Laws ch. 12, § 11I authorizes civil actions by any person who has suffered the interference or attempted interference of the rights described in § 11H.

case, Bettencourt has failed to set forth any facts showing that the defendants interfered with his rights through the use of threats, intimidation or coercion.  Accordingly, he cannot maintain a claim against either of the officers under the MCRA.

Pursuant to the MCRA,

> "[a] '[t]hreat' ... involves the intentional exertion of pressure to make another fearful or apprehensive of injury or harm.  'Intimidation' involves putting in fear for the purpose of compelling or deterring conduct .... ['Coercion' involves] the application to another of such force, either physical or moral, as to constrain [a person] to do against his will something he would not otherwise have done."

Farrah ex rel. Estate of Santana, 725 F. Supp. 2d at 247 (quoting Planned Parenthood League of Mass., Inc. v. Blake, 417 Mass. 467, 474, 631 N.E. 2d 985 (1994)) (alterations in original).  However, "[a] direct violation of a person's rights does not by itself involve threats, intimidation, or coercion."  Id. at 248 (quotations and citations omitted).  Thus, Arruda's conduct in grabbing Bettencourt and pepper spraying him, even if it amounts an illegal seizure or excessive force, is insufficient to establish liability under the MCRA. See Santiago v. Keyes, — F. Supp. 2d —, 2012 WL 3596968, at *5 (D. Mass. Aug. 21, 2012) (finding that unlawful seizure and arrest, without more, could not satisfy "the MCRA's requirement that a plaintiff establish threats, coercion, or intimidation *in addition* to a constitutional violation"); Orwat v. Maloney, 360 F. Supp. 2d 146, 164 (D. Mass. 2005) (finding that while defendant's use of excessive force constitutes a direct violation of plaintiff's constitutional rights, it "does not by itself involve threats, intimidation, or coercion and thus does not implicate the [MCRA]").  While Bettencourt has put

forth sufficient facts to support a claim that Arruda's conduct constituted a direct

violation of his Fourth Amendment rights, "[w]hat is absent . . . is any showing (or even

pleading) that the violation was intended to coerce [Bettencourt] into refraining from the

exercise of a right or privilege secured by law."  Farrah ex. rel. Estate of Santana, 725 F.

Supp. 2d at 248.  Therefore, Bettencourt has failed to raise a genuine issue of material

fact, and the defendants are entitled to summary judgment on Bettencourt's claims under

the MCRA.

## IV.  CONCLUSION

For all the reasons detailed herein, the "Defendants' Motion for Summary

Judgment" (Docket No. 31) is ALLOWED IN PART and DENIED IN PART.

Specifically, the motion is allowed with respect to all of the claims against McCarthy,

and with respect to Bettencourt's claims against Arruda for violation of his right to equal

protection and for deprivation of his rights under the MCRA.  However, the motion is

otherwise denied.

　　　　　　　　　　　　　　　　　 / s / Judith Gail Dein　　　　　　　　
　　　　　　　　　　　　　　　　Judith Gail Dein
　　　　　　　　　　　　　　　　U.S. Magistrate Judge